RENDERED:  DECEMBER 18, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0281-MR

CLETUS ROBBINS, JR.                                         APPELLANT


                    APPEAL FROM HARLAN CIRCUIT COURT
v.              HONORABLE KENT HENDRICKSON, JUDGE
                    ACTION NO. 14-CR-00083


COMMONWEALTH OF KENTUCKY                              APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  LAMBERT, MAZE, AND L. THOMPSON, JUDGES.

MAZE, JUDGE:  Cletus Robbins, Jr. appeals from a judgment of the Harlan

Circuit Court denying his request, pursuant to Kentucky Rules of Criminal

Procedure (RCr) 11.42, for post-conviction relief.  For the following reasons, we

affirm.

Following a jury trial, Robbins was convicted of first-degree kidnapping with serious physical injury; first-degree robbery; two counts of second-degree assault (against victim Benji Stout); first-degree unlawful imprisonment (of victim Gabrielle Cochran); two counts of wanton endangerment (of Stout and Cochran); two counts of intimidating a participant in the legal process (of Stout and Cochran); and being a persistent first-degree felony offender. The jury recommended a total sentence of twenty-five years in prison and the trial court imposed that sentence.

On direct appeal, the Kentucky Supreme Court affirmed Robbins' convictions. *Robbins v. Commonwealth*, No. 2015-SC-000478-MR, 2017 WL 5494103 (Ky. Mar. 23, 2017). We adopt the facts set forth in that Opinion here:

> During the evening of May 2, 2014, Cletus Robbins Jr. and Erica Bryant visited the home of Arbin Shepherd. Later that evening, Benji Stout and Gabrielle Wright Cochran arrived at the residence. Subsequently, Robbins and Stout began to argue and the argument became physical, resulting in Stout being badly beaten and shot with a handgun. Beyond these facts, witness testimony differed as to what transpired that evening and what triggered the dispute and assault.
>
> The Commonwealth's first witness was Bryant, who was dating Robbins's step-son at the time of this incident. Bryant was with Robbins when he received a phone call about visiting Shepherd's house that evening. In her interview with the police, Bryant explained that Shepherd called Robbins to inform him that he had "got the lady," who had sold them counterfeit Xanax pills and that she would be at his house that evening. As a

-2-

consequence of this call, Bryant and Robbins went to Shepherd's home.

According to Bryant the mood in the house was tense. Asked specifically about Robbins's mood, Bryant recalled that he was angry. Once Stout and Cochran arrived at the residence, Stout was summoned by Robbins to come to the kitchen. Due to her vantage point in the living room, which was immediately next to the kitchen, Bryant was able to observe how the conflict began. Initially, Bryant heard Robbins shout at Stout that he "had got him for $600 the day before." Robbins then began to beat Stout and as the beating continued Stout fell to the ground, with Robbins kicking him in the head. The beating continued despite Stout's pleas for Robbins to stop.

Afterwards, Robbins and Carl Edward Collins, tied Stout up with a nylon rope. Robbins then placed a gun to Stout's head, stating he was going to get his $600 back from Stout. While Stout was tied up, Collins took money and illicit narcotics from his person. That money was subsequently divided among Robbins, Collins, and Shepherd.

During this period, Bryant approached Robbins asking him to calm down. In response, Robbins pointed his gun in her face and informed her that he intended to shoot Stout. Bryant put her hands up and retreated to defuse the situation. Afterwards, Robbins returned his focus to Stout, untying his restraints. However, Robbins continued to yell at Stout about the money. During this exchange Bryant heard a gunshot and realized that Stout had been shot in the chest.

Bryant was ordered by Collins to clean up Stout's blood in the kitchen. While Bryant did so, she overheard Robbins boasting that he had "got [Stout]". Later, Cochran, Stout's companion, entered the kitchen and Robbins struck her in the face. After a short

-3-

discussion, Robbins and Collins gave Stout some of his money back so he could pay for gas to return to Lexington. Prior to letting Stout and Cochran leave, Robbins told the pair not to stop on the way to Lexington or inform anyone about what had happened or he would kill Cochran's family.

The Commonwealth's second witness was Shepherd, the homeowner. Shepherd admitted to having taken Xanax the day of the assault and that as a result he was in and out of consciousness throughout the evening. Shepherd testified that Robbins had come to his house to rendezvous with Stout and Cochran. Prior to the start of the altercation in the kitchen, Shepherd overhead Stout and Robbins discussing a prior drug deal for Xanax. While in and out of consciousness, Shepherd heard "scuffling" in the kitchen. The sound of the gunshot in the kitchen, lifted Shepherd from his stupor, and he went to his room to get his gun.

Shepherd went on to explain that his concern was to calm down Robbins and get everyone out of his home. In a tense moment, Robbins and Shepherd pointed their weapons at each other, but the moment passed without violence. Later, Shepherd watched Stout leave his residence, while Bryant worked to clean up his blood. During cross-examination, Shepherd claimed to not understand the reason for the dispute between Robbins and Stout, explaining that he had purchased genuine Xanax which he used that evening. Shepherd explained that this was the second occasion in which Stout and Cochran came to his house to sell Xanax. Also, Shepherd denied that anyone had been tied up.

The Commonwealth's third witness was Collins. Collins, a convicted felon, testified that he was home in bed when he received a call from Shepherd's landline telephone, requesting that he come to the house. When Collins arrived at the residence, he discovered that Shepherd was unconscious and that Robbins had called

-4-

him from Shepherd's phone. Collins explained that had he known that it was Robbins who had called him that he would not have gone to the house, as the two men did not get along.

Robbins told Collins that the drugs that he had previously purchased from Stout were counterfeit. Further, he told Collins that Stout and Cochran were on the way to the house to sell narcotics, as they had previously done once before. Collins observed that Robbins was angry and intended to harm Stout. To avoid a fight and a possible disruption in Stout and Cochran bringing drugs from Lexington, Collins offered to buy the counterfeit drugs from Robbins. While Robbins accepted Collins's money, he remained at Shepherd's house waiting for Stout and Cochran to arrive. When Stout and Cochran failed to arrive on time, Robbins used Shepherd's home phone and his cell phone to call and threaten Cochran's family.

A short while later, Cochran arrived at Shepherd's home and questioned Robbins about why he contacted her family, as they did not know that she and Stout sold narcotics. Robbins told her that everything was fine and questioned her about Stout's whereabouts, who was still in the car. Collins testified that when Stout entered the living room, Robbins immediately got up, put his arm around Stout, and shot him in the chest. Robbins then began to beat Stout in the kitchen. During the beating, Stout screamed Collins's name in a desperate plea for help. After beating Stout for approximately ten minutes, Robbins took a taser from Stout's pocket and shocked him with it. Collins also testified about Robbins's crazed state, which was demonstrated by his subsequent use of the taser on himself.

Afterwards, Robbins pointed his gun at Shepherd, which led to Collins retrieving a gun that was located on top of the refrigerator. Collins explained that he obtained the weapon, so that if Robbins shot Shepherd, he would

be able to retaliate against Robbins. Subsequently, Collins took Cochran into the living room, away from Robbins who continued to repeat that he was going to kill and bury them. Collins testified that he was concerned that Robbins intended to kill Stout and Cochran. In an attempt to calm Cochran down, he slapped her in the face and urged her to listen to him so they could get out of the situation.

Later, Collins observed Robbins standing in front of Cochran with her shirt half buttoned; he surmised that it was due to Robbins searching her person for narcotics. After deciding to not further harm Stout and Cochran, Robbins informed the pair that if they were to contact the police that he would respond by killing Cochran's whole family. Prior to Stout and Cochran's departure, Collins helped clean up Stout and gave him advice on how to breathe in case his lung had been struck in the shooting. During his testimony, Collins denied that Stout had been tied up during his ordeal.

The Commonwealth's fourth witness was Kentucky State Police Detective Craig Miller. Detective Miller became involved in the case after receiving a report that Stout had visited Good Samaritan Hospital in Lexington claiming to be the victim of a gunshot wound. Subsequently, Detective Miller took witness statements from Stout and Cochran, created photo pack lineups, and obtained a search warrant for Shepherd's residence. The resulting search of Shepherd's residence led to the discovery of a green nylon rope, a .38 caliber handgun, and a .22 caliber rifle. Also, Stout had told the police that his beaded necklace was broken during the beating; police recovered beads in multiple locations in Shepherd's kitchen. Subsequently, Detective Miller arrested Robbins and interviewed him. In his interview, Robbins admitted to attacking Stout saying, "I beat the shit outta him; I beat his motherfucking brains out. . . ." Later, Robbins's wife provided to police the pills

that Robbins had allegedly obtained from Stout and Stout's taser.

The Commonwealth's final two witnesses were Stout and Cochran. Stout, a convicted felon, explained that he and Cochran were traveling to Harlan County to see their children who were staying with their maternal grandparents, Cochran's parents. In route to the house, Cochran received a phone call from her mother, informing her that someone had called her house. In response, Cochran informed Stout that they needed to make a stop at Shepherd's home.

After arriving at Shepherd's residence, Stout noted that there was a crowd of happy people who warmly welcomed them into the home. Subsequently, Robbins took Stout into the kitchen and began beating him with a gun. As part of this assault, Robbins struck Stout in the back of the head with the gun causing him to fall to the floor. Once on the ground, Robbins began to kick Stout, which included kicking him in the face. As Stout began to crawl towards the back door of the house, Robbins, using a racial epithet, told Stout he was going to kill him. Robbins then shot Stout in the chest.

Stout testified that he was forced into a chair and someone tried to remove his shirt. Then, Robbins observed that Stout had a taser, took it from him, and used it against him. Stout testified that throughout the beating, he was held at gunpoint. He also recounted being tied up by Bryant and Collins. Eventually, Stout was permitted to leave the residence. Prior to leaving, Stout was warned against going to the authorities, with Robbins threatening to kill Cochran's parents if he did so. Stout testified that he delayed going to the hospital in Lexington for three days due to his fear of Robbins's retaliation. During cross-examination, Stout denied possessing any illegal narcotics the night of the incident. He claimed to have $2,400 in cash stolen

-7-

from him that night, cash which he received for selling a vehicle.

Next, Cochran testified. She recounted that while on the way to visit her parents in Harlan, she received a call (the identity of the caller is unclear) in which it was made clear that Robbins was upset. The caller explained that Robbins believed that Cochran owed him money, and that she needed to meet with Robbins at Shepherd's residence. Additionally, Cochran's mother called and told her daughter that she had received a threatening call.

After arriving at Shepherd's house, Cochran told Stout to remain in the car while she went in to speak to Robbins. Cochran's efforts to resolve the situation were unsuccessful, as Robbins and Collins held her at gunpoint, while Shepherd went outside to tell Stout to come into the house. After Stout entered the residence, Robbins and Collins proceeded to beat him. In particular, Stout testified that Robbins struck Stout in the head over fifty times.

Afterwards, Robbins took Stout into the kitchen, but just before doing so pointed a gun at Cochran's head and told her to stay in the living room, and that he would deal with her next. In the kitchen, Robbins proceeded to break three chairs over Stout's head. During this period, Robbins repeatedly told Stout that he wanted $500. Subsequently, he told Bryant to get rope and she proceeded to tie Stout's hands behind his back and tie his feet together. Once Stout was tied up, Robbins took money from him and then after the robbery was completed, Stout's bindings were removed.

After robbing Stout, Robbins went into the living room and demanded money from Cochran. Cochran refused Robbins's demand, telling him that she did not owe him anything. In response, Robbins shoved his gun into her eye, then put it to her temple, before finally striking her in the head with the gun. Robbins then

demanded that Cochran take off her clothes. When she refused, Robbins pulled her shirt open and began to fondle her breasts underneath her bra. After the robbery and this incident in the living room, Stout was shot.

Cochran testified that Robbins experienced periods of lucidity, before returning to crazed and violent actions. An example of his crazed state was Robbins's repeated use of the taser on Stout while he chased him around the kitchen. Additionally, when Stout began to pray, Robbins held his hand and joined in prayer with him asking God for forgiveness. Yet, Robbins later demanded money from Stout within four days-time, and threatened Cochran about going to the police and that if she did so he would kill her family.

During cross-examination Cochran denied that she and Stout were involved in the sale of narcotics. When asked about the money that Stout had on his person at the time of the robbery, Cochran explained that he had received it as part of a social security payment. At the conclusion of Cochran's testimony, the Commonwealth briefly recalled Detective Miller, and then rested its case.

Robbins called three witnesses. His first witness was Cochran's father, Lloyd Cochran. He testified that while he was out of the house that there was a missed call and that the caller ID indicated that it was from a person with the last name of Shepherd. Subsequently, he called the number back and spoke to "a Shepherd fella." Robbins's second witness was Cochran's mother Cathy Cochran. She testified about a missed call, which her caller ID noted as being from "Arvin Shepherd." Additionally, she noted that her husband later returned the phone call.

Robbins then elected to testify on his own behalf. He explained that a couple of days before May[] 2, 2014, he had been informed by Shepherd that there would be someone at his home selling Xanax. Subsequently,

Robbins purchased $600 of Xanax from Stout and Cochran. Stout claimed that the drugs were counterfeit drugs that contained as little as three percent alprazolam.

Robbins told the jury that on the date in question he had received a call from Shepherd that Cochran and Stout were going to meet him at his residence and, consequently, Robbins would have an opportunity to get his money back. Afterward, Robbins went to Shepherd's house to wait. After approximately twenty-five minutes, Stout and Cochran arrived, with Cochran entering first.

When Stout entered the house, Robbins accused him of selling sham Xanax. Stout told Robbins that he had "something else" to offer in his car, but Robbins informed him that he did not want anything else, but he did want his money back. Shortly thereafter, a brawl started between the two men. According to Robbins, when Stout attempted to take out his taser, he was disarmed and badly beaten by Robbins. During the altercation, heroin that Stout had on his person fell to the ground; those drugs were subsequently seized by Shepherd and Collins. Robbins placed the value on those drugs at approximately $2,400. Later Robbins gave Stout $30 of his own money, so that he could afford gas to travel back to Lexington.

Robbins denied that the event was anything more than a fist fight. He denied shooting Stout or even having a gun, insisting that only Shepherd and Collins were armed with guns. Further, Robbins insisted that he did not strike Stout with chairs or tase him. Additionally, Robbins denied knowledge about rope or anyone being tied up that evening. Robbins also denied that he had hit or inappropriately touched Cochran. Finally, Robbins denied taking any money from Stout, but did admit to using some of his heroin later that evening.

According to Robbins, Stout and Cochran told Shepherd the following day that they would go to the

police, unless Robbins paid for Stout's lost heroin. Robbins attempted to explain away the other witnesses' accounts of the evening, by saying that Collins and Stout were longtime friends. Also, Robbins alleged the existence of a love triangle involving Robbins, Shepherd, and Robbins's wife who also happened to be Shepherd's former spouse.

*Id.* at *1-5 (footnotes omitted).

After the Kentucky Supreme Court denied Robbins' direct appeal, he filed a motion for post-conviction relief pursuant to RCr 11.42, alleging ineffective assistance of counsel. The trial court denied Robbins' motion. The trial court also denied Robbins' motion for an evidentiary hearing, holding that the issues of fact or law raised in Robbins' motion could be resolved by examining the record.

For his appeal to this Court, Robbins argues that the trial court abused its discretion by denying his RCr 11.42 motion based on four[1] arguments: (1) his attorney failed and/or refused to request a lesser-included jury instruction for "physical injury" instead of "serious physical injury" relating to the kidnapping charge; (2) his attorney failed and/or refused to obtain independent testing of the Xanax, which may have proven he ingested something that "made him go crazy"; (3) his attorney failed and/or refused to request an intoxication or diminished capacity jury instruction; and (4) his attorney failed and/or refused to investigate

---

[1] Robbins' RCr 11.42 motion before the trial court set forth six errors, but he is only arguing four of the six errors for this appeal.

Stout's drug trafficking. In addition, Robbins claims the trial court should have held an evidentiary hearing on these four alleged errors.

## STANDARD OF REVIEW

The standard of review for claims of ineffective assistance of counsel was established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The defendant must establish that trial counsel made serious errors resulting in a performance below the objective standard of reasonableness and that the defective performance prejudiced the defense so seriously that there is a reasonable likelihood that the result of the trial would have been different absent the errors. *Fegley v. Commonwealth*, 337 S.W.3d 657, 659 (Ky. App. 2011). A reviewing court must focus on the totality of the evidence before the judge when assessing the performance of trial counsel and must presume that counsel rendered effective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 2586, 91 L. Ed. 2d 305 (1986). Counsel's performance is not judged in a vacuum but by the degree that the performance deviates from the quality of representation customarily provided by the legal profession. *Centers v. Commonwealth*, 799 S.W.2d 51, 55 (Ky. App. 1990).

## ANALYSIS

**Lesser-included jury instruction for "physical injury" instead of "serious physical injury" relating to the kidnapping charge**

The jury found Robbins guilty of first-degree kidnapping with serious physical injury to Stout. Pursuant to Kentucky Revised Statutes (KRS) 509.040(1), "[a] person is guilty of kidnapping when he unlawfully restrains another person and when his intent is . . . (c) [t]o inflict bodily injury . . . ." Then, under subsection (2) of KRS 509.040, kidnapping is considered a Class A felony if "the victim has suffered serious physical injury during the kidnapping . . . ."

Robbins argues the evidence was insufficient to prove that Stout suffered a "serious physical injury" and, therefore, his trial counsel provided ineffective assistance by failing to request the lesser-included instruction of "physical injury" instead. Specifically, Robbins claims that Stout waited three days before going to the hospital, so Stout's injury was not "serious" as it did not require immediate medical attention. Robbins further argues that the jury only found him guilty of second-degree assault with "physical injury." So, he reasons that the kidnapping instruction should have similarly only included the "physical injury" element.

In its order, the trial court held that trial counsel committed no error in not objecting or moving for a directed verdict, judgment notwithstanding the verdict (JNOV), or new trial regarding the kidnapping with "serious physical injury" instruction. The trial court explained that the evidence fully supported the instruction because Robbins caused physical injury to Stout which created a

-13-

substantial risk of death and, pursuant to KRS 509.040(2), "serious physical injury" is defined as "*physical injury which creates a substantial risk of death*, or which causes serious or prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." KRS 500.080(15) (emphasis added).

When claiming ineffective assistance of counsel for failure to object to a jury instruction, a defendant must show that the instruction was given in error. *Commonwealth v. Davis*, 14 S.W.3d 9, 11 (Ky. 1999), *as modified* (Jan. 20, 2000). "In other words, if the record does not support the conclusion that the objection should have been sustained, then there can be no ineffective assistance of counsel for failing to object." *Id.* Therefore, "if the instructions were not in error, an evidentiary hearing to determine why defense counsel did not object to them would be futile and pointless." *Id.*

Here, the kidnapping instruction was not given in error. Despite Robbins' testimony to the contrary, the evidence showed that Robbins shot Stout through the chest; kicked Stout; shocked Stout with a Taser, and beat Stout, especially about the head. Cochran's testimony that Stout's clothes were "absolutely soaked in [blood]" also shows that Stout lost a substantial amount of blood. Likewise, Detective Miller testified about the amount of blood when he described the pains taken to mop and bleach the blood from the kitchen floor and

clean the adjacent living room carpet. Testimony also proved that Stout was so weakened from his injuries that he could not stand or sit upright in a chair and had become non-responsive as he went in and out of consciousness.

From the foregoing evidence, the jury could reasonably infer that Stout was at a substantial risk of death by the time the ordeal ended. And, as the Kentucky Supreme Court held in *Brooks v. Commonwealth*, 114 S.W.3d 818, 824 (Ky. 2003), a serious loss of blood alone can create a substantial risk of death. Simply because Stout did not immediately go to the hospital does not change the life-threatening nature of his injuries. Moreover, Stout testified that he delayed going to the hospital due to his fear of Robbins' retaliation, which several witnesses confirmed through their testimony that Robbins threatened to kill Cochran's parents if Stout or Cochran went to the authorities.

We also note that the jury was given two lesser-included instructions to consider: (1) kidnapping (without the serious physical injury element); and (2) first-degree unlawful imprisonment. Thus, the jury had an option to find Robbins not guilty of kidnapping with serious physical injury and could have, instead, found him guilty or not guilty of one of these lesser-included instructions. We further note that Robbins' trial counsel presented a closing argument that advanced Robbins' exact argument on appeal—namely, that Stout was not seriously injured. After hearing this argument, the jury still found Robbins guilty of kidnapping with

-15-

serious physical injury even though it could have found him not guilty of that charge and had the option to consider two lesser-included charges.

Based on the totality of the evidence, the jury instruction for kidnapping with serious physical injury was warranted and not given in error. We do not believe the outcome of the case would have been different had Robbins' trial counsel objected because the evidence supported the kidnapping with serious physical injury instruction. Accordingly, we conclude Robbins' trial counsel was not constitutionally ineffective and Robbins was not prejudiced by her performance.

**Independent testing of the Xanax**

Robbins next argues that his trial counsel was deficient in not obtaining independent testing of the Xanax. He claims he told his trial counsel he wanted the Xanax tested "because something he ingested made him go crazy." As support, he notes Collins, who was present during the incident, testified that Robbins was in a crazed state. Robbins reasons that "his actions were those of someone who had unknowingly ingested something other than [X]anax – a 'downer'" and the substance was "not conducive to his otherwise calm disposition."

In response, the Commonwealth claims the Xanax was tested and Jamie Hibbard, with the Kentucky State Police (KSP) laboratory, testified that the

-16-

pills contained alprazolam, the active ingredient in Xanax. Thus, an independent laboratory would have arrived at the same results.

Robbins' argument is entirely self-serving speculation. He provides no evidence that he ingested something that made him "go crazy." In fact, at trial, Robbins never testified that he ingested something that made him "go crazy." He only testified that Stout sold him fake Xanax. More likely, it seems that Robbins wanted the Xanax tested so he would know the exact components of the pills because he still suspects that Stout sold him "fake Xanax."

When a defendant claims ineffective assistance of counsel for not obtaining an expert, "he must establish how he was prejudiced by the alleged failure of counsel." *Parrish v. Commonwealth*, 272 S.W.3d 161, 179 (Ky. 2008) (citation omitted). Here, Robbins fails to establish how he was prejudiced by not having the Xanax tested by an independent laboratory. Moreover, "it is not necessary 'in all cases [for] an attorney [to] hire a rebuttal expert witness in order to avoid being deemed ineffective.'" *Commonwealth v. York*, 215 S.W.3d 44, 48 (Ky. 2007) (quoting *Thompson v. Commonwealth*, 177 S.W.3d 782, 786 (Ky. 2005)). In this case, additional laboratory testing was not critical given the fact that Robbins never testified that he ingested something that made him "go crazy." Therefore, his trial counsel was not constitutionally ineffective in not obtaining independent laboratory testing of the Xanax.

**Intoxication or diminished capacity jury instruction**

Robbins argues his trial counsel was ineffective for not requesting jury instructions on intoxication or diminished capacity. To support this argument, Robbins again claims that the "fake Xanax" had "some unknown compound in it" that changed his physiology and ability to control himself during the incident.

In response, the Commonwealth claims the evidence did not support such instructions, as Robbins never testified that he used or ingested any drugs before he beat Stout. Additionally, the Commonwealth argues that Robbins' behavior during the incident was the same behavior he displayed during the sentencing hearing when he cursed at the judge, spit on the prosecutor, and threatened the prosecution with the statement, "You better hope I never get out," as he was taken away. And, at that time, the Commonwealth notes that Robbins was in custody and, presumably, not under the influence of any drugs.

Pursuant to KRS 501.080(1), voluntary intoxication is a defense to a criminal charge if it "[n]egatives the existence of an element of the offense[.]" The Kentucky Supreme Court has interpreted that statute to mean that the defense is only justified "where there is evidence reasonably sufficient to prove that the defendant was so drunk that he did not know what he was doing." *Fredline v. Commonwealth*, 241 S.W.3d 793, 797 (Ky. 2007) (quoting *Rogers v. Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002)). "If, from the evidence presented, a

jury could reasonably conclude that the defendant was so intoxicated that he could not have formed the requisite mens rea for the offense, a voluntary intoxication instruction is warranted." *Id.*

The evidence in this case did not support a voluntary intoxication instruction. At trial, Robbins testified he knew exactly what he was doing. He assaulted and robbed Stout with the specific intention of recovering the $600 he believed he was owed. Robbins assaulted Cochran for the same reason. He never claimed that he lost his memory or control over his actions. To the contrary, his testimony confirmed that his mental and physical faculties were more than adequate.

Accordingly, Robbins' counsel had no reason to believe that a jury instruction for intoxication or diminished capacity might be appropriate. Her decision not to request such instructions was within the bounds of reasonable trial strategy because the evidence did not support such an instruction. Thus, Robbins' counsel was not ineffective for failing to request such an instruction. "It is not ineffective assistance of counsel to fail to perform a futile act." *Bowling v. Commonwealth*, 80 S.W.3d 405, 415 (Ky. 2002), *cert. denied*, 538 U.S. 931, 123 S. Ct. 1587, 155 L. Ed. 2d 327 (2003).

**Alleged failure to investigate Stout's drug trafficking**

For Robbins' last claim of error, he argues that his trial counsel provided ineffective assistance by failing or refusing to investigate Stout as a drug trafficker. He claims that, because Stout was a drug trafficker, Stout had reason to blame the incident on Robbins. Robbins also claims that Stout did not seek medical attention because he was a drug trafficker and not because he was afraid of retaliation by Robbins.

In response, the Commonwealth argues this claim is meritless because evidence was, indeed, introduced that Stout was a drug trafficker. Collins even testified that Cochran was upset when she arrived at the house the night of the incident because Robbins had contacted her family and told them that she and Stout sold drugs.

In its order, the trial court held that Stout's livelihood was irrelevant to any issue tried. Robbins' counsel was, thus, not ineffective for not pursuing such irrelevant information. We agree. The jury heard evidence that Stout was a drug trafficker and Robbins fails to establish how he was prejudiced by his counsel's alleged failure to investigate Stout's livelihood as a drug trafficker.

**Necessity of an evidentiary hearing on the four alleged errors**

Granting or denying an evidentiary hearing on allegations raised in an RCr 11.42 motion is limited to "whether the allegations in the motion can be

resolved on the face of the record . . . ." *Fraser v. Commonwealth*, 59 S.W.3d 448, 452 (Ky. 2001). "A hearing is required if there is a material issue of fact that cannot be conclusively resolved, *i.e.*, conclusively proved or disproved, by an examination of the record." *Id.* Here, the trial court determined that Robbins' motion did not raise an issue of fact or law that could not be conclusively resolved by an examination of the record. We agree. Therefore, an evidentiary hearing was unnecessary, and the trial court did not err in denying Robbins' request for one.

## CONCLUSION

For the foregoing reasons, we affirm.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Cletus Robbins, Jr., *pro se*
Sandy Hook, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Leilani K.M. Martin
Assistant Attorney General
Frankfort, Kentucky